IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

KATRINA NAUMANN,

Claimant,                                    OPINION AND ORDER

v.                                                      15-cv-829-wmc

NANCY A. BERRYHILL,
Acting Commissioner of Social Security

Defendant.

Claimant Katrina Nauma seeks judicial review of a final decision of defendant

Nancy A. Berryhill, the Acting Commissioner of Social Security, under 42 U.S.C. § 405(g),

following the denial of her application for Disability Insurance Benefits and Supplemental

Security Income.  On March 7, 2018, the court held oral argument regarding claimant's

contention that the decision of Administrative Law Judge William Spalo (the "ALJ") erred

by: (1) improperly discounting her credibility; (2) improperly discounting her treating

physician's opinion; and (3) failing to account for her limitations in the RFC.  For the

reasons discussed below, each of these errors warrants remand.


### A.  Procedural Facts

The lengthy procedural background in this case is far too familiar, unfortunately

now exacerbated by further delay in this court.  Naumann first filed an application for

Disability Insurance Benefits and Supplemental Security Income on April 4, 2011, with

an alleged onset date of December 1, 2010.  (AR 122.)  Her application was first denied

on June 21, 2011, and then again after reconsideration on November 18, 2011.  (Id.)

Claimant's hearing before an ALJ was on July 11, 2012, resulting in an unfavorable written

decision on August 3, 2012. (AR 122, 132.) This decision was vacated by the Appeals Council on October 17, 2013. (AR 137.) Claimant appeared at a remand hearing on April 9, 2014, which was followed by another unfavorable decision by ALJ Spalo on May 28, 2014. (AR 11, 29.) The Appeals Council denied review on October 20, 2015. (AR 1.) The pending petition for judicial review followed.

### B. Medical Record and Reports

On her alleged onset date, Naumann was 45 years-old with a twelfth-grade education, she was an embroiderer by trade. Naumann's medical records consist of notes and opinions of her treating physician, Dr. Robert Gage, as well as assessments of state agency doctors Mina Khorshidi, Joan Kojis, Pat Chan and Kurt Reintjes.

#### 1. Treating Physician

Dr. Gage has served as Naumann's primary care physician since approximately 1996. (*See* AR 449.) The available medical records from him range from July 2010 to December 2013, with large gaps between visits. In his earliest office note, Gage identifies fibromyalgia as one of claimant's diagnoses. (AR 385.) At that time, Gage noted that Naumann's medication "has worked very well for her, has controlled her fibromyalgia adequately, kept the pain down." He also noted that "her attitude has been good, she is able to work regularly, and she thinks the regimen is working very well for her." (AR 387.) Gage added that she "is able to work full time" and "has no problem working 8 hours per day and thinks that things are going very well for her." (*Id.*)

Her next office visit, in March 2011, painted a different picture. Gage characterized

her fibromyalgia as "making life miserable for her in terms of pain, and inability to do normal activities and inability to work." (AR 392, 395.) At that time, he noted that claimant "is a 45 year old female here for fibromyalgia that keeps getting worse x3 months." (AR 393.) In particular, she "complain[ed that] the pain [was] getting much worse." (*Id.* at 394.) Despite taking cyclobenzaprine and gabapentin, Gage noted that the "current dose [of gabapentin [wa]s not doing that much for her." (*Id.*)[1] She also "complain[ed] of her hands being extremely achy," which Dr. Gage tied to an "x-ray some years ago that did describe some mild arthritis in the hands, but not severe." (*Id.*) Gage characterized this x-ray as "show[ing] some early arthritis." (AR 395.) He further explained that arthritis studies at that time showed "some mild abnormalities," but that they were then seen as "not really [] significant." (AR 394.) He next noted that claimant "suffer[ed] from severe depression, as well as anxiety issues, and has done fairly well, taking citalopram at a dose of 20 mg daily." (*Id.*) Recognizing that her fibromyalgia "makes walking difficult[,] exercise difficult, and there are days when she is able to exercise and the next day will pay for it severely," Gage finally opined that "her pain would not allow her to work, [and] her weight gain has caused significant problems for her and her joint[] pains in her hands and knees would also be very limiting." (AR 394-95.)

A few days later, a telephone note detailed that Naumann could "no longer do her

---

[1] In addition, Dr. Gage noted that the gabapentin had caused daytime hallucinations, that "[o]ne time she was driving her mother somewhere, and had some problems seeing things and does not take it at daytime at all. She takes 300 mg at nighttime. She has not tried taking higher dose at bedtime." (AR 394.) He also noted that she had once tried amitriptyline, but it "caused severe weight gain and other side effects," and that she could not afford it or Lyrica because "[s]he will be losing insurance, does not have drug coverage for brand name drugs." (*Id.*)

normal activities," and her fibromyalgia was "[n]ot allowing her to consider any sort of gainful employment." (AR 401.) Gage added that she was taking "cyclobenzaprine and gabapentin, which she [found] somewhat useful, but the pain [was] still significantly causing problems for her and very severe." (*Id.*) Accordingly, Gage encouraged her to "increase her gabapentin dose," while recognizing her prior "problems with some serious side effects." (*Id.*)

When Dr. Gage saw Naumann again in August 2011, he noted that she "has a history of many years of fibromyalgia, the pain has gotten progressively more severe over the years to the point where now she is unable to work, and she has applied for disability." (AR 441.) Gage further explained that "the pain [wa]s debilitating, and she [wa]s unable to do much of any gainful employment or work at this point." (*Id.*) As to her medication, he noted: cyclobenzaprine, which Naumann reported helped her sleep, but was "not really" helpful with the pain, so she also took hydrocodone for pain relief; gabapentin, which was characterized as "somewhat helpful[,] but not tremendously in reducing her pain." (*Id.*) Gage noted "her chronic fatigue, which [wa]s also very debilitating" and that she then found "daily activities of living exhaust[ing]." (*Id.*) During this exam, she had 14/18 tender points, which he found "typical of fibromyalgia." (*Id.*)

A few days later, Dr. Gage completed a fibromyalgia medical source statement for Naumann, reporting that: he had been her primary care physician for approximately fifteen years; she met the American Rheumatological criteria for fibromyalgia; she was "[t]ender over 14 of the 18 points typical for fibromyalgia"; and he expected her fibromyalgia was "likely to be long-term." (AR 449.) He also identified her symptoms, including multiple

tender points, chronic fatigue, and depression. (AR 450.) Faced with the question "How often is your patient's experience of symptoms severe enough to interfere with attention and concentration?," he answered "not asked." (AR 451.) When asked about her ability to handle work stress, he wrote: "Pain is more the issue, and fatigue [both of] which are debilitating." (*Id.*) As to her medication side effects, he wrote: "Muscle relaxants -- drowsy. Amitriptyline -- weight gain. Gabapentin -- hallucinations." (*Id.*) He also noted that October 24, 2007, was the "[f]irst mention of fibromyalgia in office notes." (AR 452.)

As for Naumann's physical limitations, Dr. Gage opined that she could walk 1-2 city blocks without rest; could sit for 2 hours; and could stand for half an hour to an hour. (AR 451.) As to an 8-hour workday, he opined that Naumann could stand/walk for less than 2 hours and sit for about 2 hours; that she needed to walk around during the day, at least every two hours, if not every hour for about five to ten minutes; that she would "[l]ikely" need unscheduled breaks two to four times a day, requiring her to rest for at least 15-30 minutes before returning to work. (AR 452.) In conclusion, Gage found that Naumann: had "significant limitations in doing repetitive reaching, handling or finger[ing]"; limited hands for grasping, turning or twisting objects to 25% of the time, fine manipulations to 50%, and arms' reaching to 5%; "on a good day," could bend or twist for "at most" 5% of the time; and would miss 2-4 days of work each month. (AR 453.)

Dr. Gage's next office note is from July 2012, in which he noted Naumann's "formal diagnosis of fibromyalgia[, which] has been made in the past on the basis of her symptoms of persisting musculoskeletal pain for many years, and the fact that she has had 14 of 18 typical fibromyalgia trigger points positive for pain on palpation." (AR 472.) He added

that "[s]he has severe fatigue, cannot stand to sit or stand more than about an hour or 2 at the most before she has to move around or rest, and finds that full-time employment is impossible for her." (*Id.*) He further noted that she was working part-time, her work was very flexible, and her boss permitted "her to work at her own pace," and allowed her to rest as necessary. (*Id.*)

Following this appointment, Dr. Gage wrote a letter to support Naumann's disability claim. In the letter, Gage began by noting that he knew and treated her for approximately fifteen years, as well as treated her for fibromyalgia "for a number of years." (AR 468.) He again explained her fibromyalgia diagnosis, including "persistent symptoms of severe fatigue and inability to stand or sit for more than an hour or 2, having difficulty with sleep disturbance and only minimally responsive to medical therapy" and 14/18 positive trigger points. (*Id.*) Gage added that "[h]er symptoms appear to be purely musculocutaneous in origin" and that there was "no evidence of any specific joint involvement." (*Id.*) Additionally, Dr. Gage explained that Naumann could "walk only 1 or 2 blocks without rest," and she could not "tolerate sitting or standing for more than 1 or 2 hours at most[,] . . . needs to be able to change position at least every 1 to 2 hours if she is sitting or standing, and require[s] frequent breaks when performing activities." (*Id.*) Likewise, she was "extremely limited in her ability to lift heavy objects," such that she could only lift up to 10 pounds occasionally. (*Id.*) Dr. Gage added that she was "very limited in being able to perform any sort of repetitive activities." (AR 469.) Acknowledging that Naumann had tried to work full-time previously, he further found her doing so long-term would be impossible, "especially if she does not have adequate frequent

breaks for rest." (AR 468.)

Dr. Gage next explained that her fibromyalgia had "persisted and worsened over the past 5 years . . . especially in terms of her fatigue, inability to perform activities for more than an hour or 2, and the level of pain she is experiencing." (AR 469.) Gage again acknowledged that "her medications may have helped the situation somewhat and possibly kept her from progressing to some degree over the last year or 2, [but again that] if anything her symptoms have worsened and I do not anticipate that there is any likelihood that she will improve in the future." (AR 469.) Gage also noted once again that he considered her symptoms "to be long term and likely of a permanent nature," such that "improvement [would] be very unlikely." (*Id.*) As to medications, he added that some had "caused side effects," explaining that:

> She has taken paroxetine (Paxil) in the past, which caused her to have severe weight gain, some muscle relaxant caused drowsy affects, and she can take cyclobenzaprine only at bedtime. As mentioned above gabapentin, when initially she was placed on a fairly high dose, caused hallucinations. Her current dose is tolerated, and while it is somewhat helpful, it has not reduced her symptoms adequately to allow her to pursue normal activities.

(AR 468.)

Naumann did not see Dr. Gage again until October 2013, when she had "quite a bit of pain in the typical areas of fibromyalgia." (AR 481.) Gage noted that her cyclobenzaprine and gabapentin were "somewhat helpful," but that her "pain [was] quite severe at times." (*Id.*)

Finally, the last note from Dr. Gage is a telephone note from December 21, 2013, recording claimant's complaint that "this winter has been especially bad," even though in

the past, "wintertime has not been a bad time of year for her." (AR 482.) Gage added that Naumann was "[u]nder a fair amount of stress at work, but says overall the fibromyalgia has been increasing greatly and causing quite a bit of pain for her." (*Id.*) He considered the major fibromyalgia flare up to possibly "be secondary to being somewhat stressed at work." (*Id.*) And her medications (gabapentin, cyclobenzaprine, and citalopram) "had helped previously, but currently is not really helping and the fibromyalgia pain . . . is getting much worse." (*Id.*)

### 2. State Agency Physicians

State agency doctors Mina Khorshidi, Joan Kojis, Pat Chan and Kurt Reintjes completed various reports about Naumann. In June 2011, Dr. Kojis completed a psychiatric review, concluding in contrast to Dr. Gage, that claimant's depression was not severe. (AR 426.) Kojis found that claimant had only "mild" limitations on activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace; and had no episodes of decompensation. (AR 433.) She also noted: claimant's use of citalopram for depression; in July 2010, claimant "reported that her medication was working well and reported no problems with depression"; and in March 2011, "claimant declined offers to switch medications and remains on the Citalopram with no complaints of increased depression." (AR 435.) Kojis further noted claimant's activities and ability to care for herself. (*Id.*) Finally, Kojis found claimant's statements to be "consistent with the medical records and are fully credible." (*Id.*)

Drs. Khorshidi and Chan completed physical residual functional capacity assessments of claimant in June and November of 2011, respectively, concluding that the

claimant: could occasionally lift 20 pounds and frequently lift 10 pounds; could stand, walk or sit for six hours; and had no limits on her ability to push or pull. (AR 416; AR 456-57.) Neither identified postural, manipulative, visual, communicative, or environmental limitations. (AR 417-19; AR 458-60.) Khorshidi added that: "Claimant indicates that she has no limitations with personal cares, is able to make meals, perform household chores and run errands as needed," and socializes outside her home every six weeks, attending tractor/truck pulls and racing events, as well as gardening. (AR 422.) While Khorshidi found the claimant's statements were only "partially credible," because her stated limitations were not supported by her medical records (AR 420), Chan found her statements "credible." (AR 463.) Both found that Naumann was capable of performing light work. (AR 422; AR 463.) Dr. Khorshidi's evaluation predated Dr. Gage's fibromyalgia medical source statement, while Dr. Chan acknowledged that his conclusions were "significantly different" from Dr. Gage's findings, adding that "the physical restrictions provided are not consistent with the objective findings," such that "little weight is given to this MSS." (AR 462.)

Finally, Dr. Reintjes examined claimant and completed a medical source statement of ability to do work-related activities (physical) on March 5, 2014, as well as submitted an undated report based on that examination. Reintjes began by noting that Naumann complained of "arthritic pain in her bilateral hands and feet," then acknowledged that she "describe[d] having a long history of fibromyalgia," but failed to "describe classic fibromyalgia tender points." (AR 496.) He further noted her use of gabapentin, which "ha[d] been relatively helpful"; her use of allopurinol to control her gout; and her use of

citalopram for depression, hydrochlorothiazide for swelling, and cyclobenzaprine and minocycline for prevention of pilonidal cysts. (*Id.*) Reintjes noted also that Naumann: continued to work part time; reported she could walk "up to one block," but would need "30 to 60 minutes of rest"; could stand or sit for 2 hours; and she could lift 5 pounds at a time. (*Id.*) He further found tender points "in the upper bilateral trapezius and rhomboid muscles and into the mid area of the back" to be "significant," "with a sharp guarding pain with a moderate degree of palpation pressure," but that those "in the lower extremities [and at the distal joints of the upper extremities] were not impressive." (AR 497.) Reintjes' conclusions were that: (1) she reported arthritic pains in her hands and feet, which were not seen during the examination; and (2) while she "has a note that there is a history of fibromyalgia[, ] today the classic diagnosis of fibromyalgia would not be met due to the limitation of tender points required for a positive diagnosis." (AR 498.)

As to Naumann's ability to do work, Dr. Reintjes concluded: (1) she could lift or carry up to 20 pounds occasionally (AR 501); (2) she could sit or stand for 2 hours at a time, and walk for one hour at a time, such that during an 8-hour workday she could sit for 8 hours, stand for 4 hours, and walk for 2 hours (AR 502); (3) she could frequently reach, and occasionally handle, finger, feel or push/pull with both hands (AR 503); and (4) she could never climb ladders or scaffolds, but could occasionally climb stairs or ramps, balance, stoop, kneel, crouch or crawl (AR 504).

### C. ALJ's Decision

At the outset of the opinion, the ALJ addressed the Appeals Council's remand order, which required him to: (1) perform additional evaluation of claimant's treating physician,

because his initial decision afforded Dr. Gage's opinions little weight based on reasons "not borne out by the evidence" and he had deceptively quoted from Gage's opinions; (2) seek additional information about claimant's fibromyalgia; (3) obtain from a medical expert evidence to clarify the nature and severity of claimant's impairment; (4) consider and provide evidentiary references for the claimant's RFC; and (5) obtain supplemental evidence from a VE, if warranted, to "clarify the effect of the assessed limitations on the claimant's occupational base." (AR 11-12.) The ALJ then concluded that "presumably the rest of the decision was satisfactory and will be addressed as such throughout this decision." (AR 12.)

The ALJ determined that the claimant -- other than from March through August 2013 -- had not engaged in substantial gainful activity since her alleged onset date. (AR 15.) He further found that she had two severe impairments -- obesity and fibromyalgia -- while concluding that her depression and asthma were non-severe impairments because the depression was controlled with medication and she was not pursuing ongoing therapy, and despite her history of asthma, she smokes a pack of cigarettes daily, does not use asthma medications, and prior upper respiratory infections were treated with antibiotics. (*Id.*) In particular, the ALJ explained that he evaluated Naumann's depression under Paragraph B's four functional areas, determining that she had mild limitations in: (1) the activities of daily living; (2) social functioning; and (3) concentration, persistence, or pace; and had had no episodes of decompensation. (AR 15-16.) The ALJ concluded that her impairments did not meet or medically equal a listed impairment. (AR 16-17.)

The ALJ then determined that Naumann retained the "residual functional capacity

to perform less than the full range of sedentary work" because: (1) she needed to "alter her position after two hours"; (2) could only "occasionally stoop and finger, bilaterally"; and (3) could not kneel or be exposed to frequent vibration. (AR 17.) Still, he found she "would not be off task more than 10% of the work period." (*Id.*) This determination was based on the ALJ's conclusion that "claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible." (AR 18.)

The ALJ's credibility determination in particular was based on: (1) "relatively infrequent trips to the doctor for the allegedly disabling symptoms," which resulted in (2) "essentially routine and/or conservative in nature" care;[2] (3) claimant's failure to seek treatment from a specialist; (4) claimant's complaint of significant hand pain, which was contradicted by normal blood work and only mild degenerative disease; (5) claimant's function report from May 2011, which "outlined no limitation in tending to her personal cares, preparing meals and performing household chores";[3] (6) "no abnormalities" in her sensory examination and "normal" motor function without loss of muscle strength, despite 14 tender points; (7) a lack of evidence she sought mental health treatment and failed to

---

[2] The ALJ explained that claimant "ha[d] not received the type of treatment expected," by noting that she "did not seek treatment until late March 2011, and has seen Dr. Gage only seven times between December 2010 and December 2013, with no treatment records after this date" and there are no records of hospitalizations or ER visits. (AR 22.) The ALJ faulted the claimant for large gaps between appointments with Dr. Gage and that she often would complain of worsening symptoms and decreased effectiveness of her medications when she saw him. (AR 18-20.)

[3] Specifically, the ALJ noted her ability to care for her cats, take the trash out, mow the lawn, plant flowers, socialize with friends every six weeks, and attend racing events and truck/tractor pulls, which "reveal[ed] daily activities not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (AR 18, 22.) The ALJ noted that claimant could also do her own grocery shopping. (AR 22.) "These rather vigorous activities of daily living are inconsistent with reports of wholly debilitating symptoms." (*Id.*)

return to Dr. Gage until July 2012, despite reporting worsening fibromyalgia and depression in a January 2012 disability report; (8) the short time between when claimant was laid off in November 2010 and her alleged onset date of December 1, 2010; (9) claimant's full and part-time work since her alleged onset date;[4] (10) claimant's application for and receipt of unemployment compensation, which are conditioned on a readiness and ability to work; (11) evidence not fully validating her assertions about her medications;[5] and (12) she testified to being diagnosed with rheumatoid arthritis, but that diagnosis was not in her medical records. (AR 18-19, 22-23.)

The ALJ gave only "some weight" to the opinions of Dr. Gage. As to the August 2011 questionnaire, the ALJ declined to give it controlling weight because: (1) Gage had only seen the claimant twice since her alleged onset date; (2) the proposed limitations were inconsistent with claimant's reported activities; (3) Gage indicated that the restrictions were applicable since 2007, which was inconsistent with the alleged onset date of December 1, 2010, since claimant had been working; and (4) Gage at least partially relied

---

[4] The ALJ noted that in July 2012, at the time of her first hearing, claimant worked 8-10 hours a week cutting vinyl signs and later evidence showed that she worked full-time from March–August 2013 for a roofing company, which continued to employ her for 24 hours/per week thereafter until March 2014. (*Id.*) The ALJ added that because there was no evidence that claimant's medical condition had severely declined, "a reasonable inference" was "that the claimant's impairments would not currently prevent the performance of that job, since it was being performed adequately at the time of the layoff." (*Id.*) There also are no treatment records from the time period in which she worked full-time. (*Id.*)

[5] Specifically, the ALJ noted that the claimant testified that her pain medications helped somewhat, but that her gabapentin prevented her from thinking clearly and caused confusion, while the muscle relaxers were no longer helpful, but made her drowsy. (AR 23.) However, the ALJ found Naumann had never complained about confusion to Dr. Gage, took the muscle relaxers only at night and had previously consistently reported their efficacy. (*Id.*) Further, she had complained about the gabapentin causing daytime hallucinations, which she addressed by decreasing her dosage and taking it only at night, resulting in her tolerating it without problem in July 2012. (*Id.*)

on claimant's "subjective report of symptoms and limitations." (AR 23-24.) As to Gage's July 2012 letter, the ALJ again declined to give the opinions controlling weight, this time because: (1) the letter boiled down to an opinion that "claimant's fibromyalgia is debilitating and disabling," which was a question "reserved to the Commissioner"; (2) Gage had only seen the claimant three times; (3) at the appointment where Gage wrote the letter, claimant reported severe fatigue and persistent symptoms, that her medications helped somewhat, and that she considered her symptoms "disabling and debilitating," despite working part-time and maintaining normal range of motion and symmetrical reflexes; and (4) Gage implied that her limitations likely began in 2007 and were permanent, even though the claimant had worked full-time for several months in 2013, told the unemployment board that she was ready and able to work, and had daily activities that exceeded the limitations provided by Gage. (AR 26.)

The ALJ also gave the opinion of Dr. Reintjes, "some but not significant weight" because while his opinion was consistent with his one-time examination, his conclusion that fibromyalgia's definition was not met that day cast doubts on his conclusions due to claimant's history of treatment for fibromyalgia. (AR 27.) This opinion, the ALJ determined, was "generally consistent with the residual functional capacity." (AR 26.)

The ALJ similarly gave "some weight" to the state agency physicians' opinions "in finding the claimant capable of performing exertionally light work." (AR 27.) He explained that those physicians "are licensed medical professionals who reviewed a significant portion of the medical evidence and possess specialized knowledge and training in assessing impairments and limitations based on the rules and regulations of the Social Security

Administration," although he added that "subsequent evidence may validate a reduction to the exertional requirements of sedentary work." (*Id.*) The ALJ explained that while "the medical records do not support the degree of limitations the claimant has alleged," he was "giving her subjective reports the greatest benefit of the doubt while also considering her relatively vigorous activities of daily living, her intermittent treatment with . . . only [a] general practitioner, and her full time work for several months followed by continuous receipt of unemployment benefits." He concluded that her weight problems and fibromyalgia "limit her to . . . sedentary work with no kneeling, with a position change after two hours and with occasional stooping and fingering bilaterally, avoiding concentrated exposure to frequent vibration." (*Id.*) Finally, the ALJ concluded that claimant was not disabled because she was either capable of performing some of her past relevant work or that she could be a surveillance system monitor, information clerk, or a credit checker. (AR 27-28.)

## OPINION

As previously noted, the decision on appeal is the second issued by ALJ Spalo in this case. The first was returned to him by the Appeals Council with specific directions. (AR 11-12.) After outlining these directions at the start of his opinion, the ALJ immediately concluded that "presumably the rest of the [earlier] decision was satisfactory and will be addressed as such throughout this decision." (AR 12.) Later in his opinion, he notes that "[m]uch of the substantive analysis here was taken from the original decision, which was affirmed in all respects other than the evaluation of opinion evidence, with the consideration of the additional evidence submitted since the previous decision was issued."

(AR 18.)  This -- combined with the errors in reasoning discussed below -- raises concerns about his ability to fairly evaluate the evidence.  While this does not rise to the level of bias requiring remand before a new ALJ, *see Keith v. Barnhart*, 473 F.3d 782, 788-89 (7th Cir. 2007), this court recommends that the Social Security Administration consider doing so on remand.

## I.  Credibility Determination

The ALJ identifies twelve reasons why he discounted the claimant's credibility.  (*See* AR 18-19, 22-23.)  Approximately two-thirds of those reasons are improper, making the ALJ's credibility determination "patently wrong."  *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

Two related reasons for discrediting Naumann were her: (1) "relatively infrequent trips to the doctor for the allegedly disabling symptoms," which resulted in care that was "essentially routine and/or conservative in nature"; and (2) failure to seek treatment from a specialist.  (AR 18.)  As an initial matter, claimant argues that these are improper considerations because she lacked insurance.  (Pl.'s Opening Br. (dkt. #12) 12.)  In fact, Naumann informed her doctor in March 2011 that she was "losing [her] insurance" (AR 394), and she informed the ALJ that her lack of insurance limited her ability to see her doctor (AR 51).  In an undated disability report form, claimant explained that she "attempt[ed] to have regular evaluations but due to lack of insurance [she] d[id] not go as often because of the expense of Dr. visits."  (AR 297.)  In response, the government argues that the claimant at least had insurance while she was employed full time, yet she failed to see a doctor during that period.  (Opp'n (dkt. #13) 12-13.)  As claimant pointed out,

however, the ALJ failed to ask her why.  (Pl.'s Opening Br. (dkt. #12) 11-12.)  Thus, this was an improper consideration.  *See Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013) ("[A]n administrative law judge is not allowed to infer from an applicant's failure to have sought medical care that [s]he's a malingerer without asking [her] *why* [s]he didn't seek care -- and specifically whether [s]he had health insurance." (internal citations omitted)).

Claimant also contends that "the only treatment for fibromyalgia *is* conservative treatment."  (Pl.'s Opening Br. (Dkt. #12) 12-13 (emphasis original).)  Plaintiff acknowledges that Pilates, massage, chiropractic treatments, and acupuncture are the available treatment options, but that "it was clear that Plaintiff did not have insurance or the financial means to afford such treatments."  (*Id.*)  In response, the government argues that her doctor could nonetheless have -- but failed to -- recommend these treatments.  (Opp'n (dkt. #13) 12.)  After reviewing her medical records, it appears that Dr. Gage did not recommend these treatments, nor did he recommend a more aggressive approach.  It is unfair to penalize a patient for failing to pursue treatments that she was apparently never offered.  Similarly, it was improper for the ALJ to fault her for not having any emergency room or hospital visits (AR 22), both because of her lack of insurance *and* because it is unclear what type of treatment she *could* get there for fibromyalgia.

As to the ALJ's criticism that claimant never saw a specialist, that, too, is an unfair basis on which to fault the claimant.  Her medical records do not show that Dr. Gage suggested or recommended she pursue such treatment even though he certainly credits her,

at times, debilitating symptoms.[6]  In June 2014, the claimant wrote a letter to her then-attorney explaining that:

> in June, 2014 I tried to find a rheumatologist to diagnose/treat my fibromyalgia.  The first office I called told me to call my insurance company to see if they would pay.  The next office I called told me the doctors DO NOT treat fibromyalgia patients once you are identified as a fibromyalgia patient you are sent back to your referring physician.  This, according to the 2nd office, is a directive from the American College of Rheumatology.

(AR 380.)[7]  The American College of Rheumatology explains that "often a rheumatologist detects [fibromyalgia]" but that "[y]our primary care physician can provide all the other care and treatment of fibromyalgia that you need."  Fibromyalgia, Am. Coll. Rheumatology, https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Fibromyalgia (last visited Mar. 14, 2018).

Similarly, the ALJ relied on a lack of abnormalities in her sensory exam and "normal" motor function without loss of muscle strength, despite her fibromyalgia tender points.  (AR 19.)  As the Social Security Administration recognizes, fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months."  Social Security Ruling, SSR 12-2p, Titles II and XVI: Evaluation of Fibromyalgia, 77 Fed. Reg. 43,640, 43641 (July 25, 2012).  "Symptoms and signs" listed as "Fibromyalgia diagnostic

---

[6] Notably, in his statements to the Social Security Administration, Dr. Gage states that Neumann's fibromyalgia diagnosis first appears in his records in October 2007.  (*See* AR 449; *but see* AR 482 ("Katrina has a diagnosis of fibromyalgia for the past 16 years[.]").)  However, the medical records on file begin in July 2010 (*see* AR 385), years after the initial diagnosis

[7] Her attorney submitted her letter to the Appeals Council.  (*See* AR 375.)

criteria" include:

> muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms.

*Id.* at 43642 n.9.

Further, as the Seventh Circuit has recognized, "[t]he extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment." *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018) (citing *Vanprooyen v. Berryhill*, 864 F.3d 567 (7th Cir. 2017)); *see Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[I]t is difficult to determine the severity of [fibromyalgia] because of the unavailability of objective clinical tests."); *see also Vanprooyen*, 864 F.3d at 572 ("An 'ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it.'" (quoting *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009))). Thus, the claimant's "normal" motor function and senses cannot not be held against her. *Cf. Sarchet*, 78 F.3d at 307 ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced.").

The ALJ additionally faulted the claimant for testifying about having rheumatoid arthritis because her records failed to "validate this statement." (AR 23.) Likewise, the

ALJ found her complaints about significant hand pain to be contradicted by normal blood work and mild degenerative disease. (AR 18.) Admittedly, some medical records are contradictory concerning whether or not claimant had arthritis. In March 2011, Dr. Gage noted that "[s]he had an x-ray some years ago that did describe some mild arthritis in the hands, but not severe." (AR 394.) In that same note, Gage also recorded Naumann's "concern[] about the possibility of other kinds of arthritis" and that "[s]he had arthritis studies performed some years ago, and did have some mild abnormalities, although it was felt at that time to not really be significant." (*Id.*) His impression was that her hand pain was "likely" caused by "osteoarthritis, as an xray from years ago had shown some early arthritis." (AR 395; *see also* AR 401 (recognizing that her blood tests showed "no special kind of arthritis" but that "she probably has some early osteoarthritis").) However, in Gage's July 2012 letter, he said that Naumann "had no evidence of any specific joint involvement such as arthritis[.]" (AR 468.) In 2013, telephone notes document conversations about high uric acid levels, including that her "rheumatoid arthritis test is again high but it [has] been higher in the past" and that this could be a sign of gout, which "may be hurting [her] joints and causing arthritis to develop." (AR 478.) The claimant's testimony that she had arthritis is at least arguably supported by her medical records, and she likewise should not be penalized for her confusion or her treatment provider's arguable inconsistencies as to the impact of arthritis on her condition.[8]

---

[8] Because any fibromyalgia diagnosis requires ruling out other causes for the pain, rather than being inconsistent, Dr. Gage's 2012 statement may be indicative of ruling out arthritis as a cause of Naumann's pain, especially because it is followed by "[h]er symptoms appear to be purely musculocutaneous in origin." (AR 468.) On remand, this may be a subject for further inquiry.

Finally, the ALJ faulted her for applying for and receiving unemployment compensation at various points since November 2010 because the application and receipt of benefits are conditioned on a readiness and ability to work. Claimant argues that this is "very weak support for a negative credibility determination" and that the SSI regulations instruct applicants to seek all other benefits they possibly qualify for or risk being ineligible for SSI. (Pl.'s Opening Br. (dkt. #12) 15-16.) Specifically, the regulation instructs that the Administration will inform applicants of other benefits they may qualify for, and if the applicant fails to seek those benefits within 30 days -- without justification -- the SSI application will be rejected. To her credit, Naumann explained in a July 2011 disability report appeal form that she "continue[s] to seek employment even on a part[-]time basis but continue[s] to meet with no response from [prospective] employers." (AR 330.)

While other bases relied on by the ALJ for discounting claimant's credibility appear to have merit, they do not salvage his credibility determination on this record. For instance, the ALJ is correct that Naumann's reports about her activities of daily living are (1) "rather vigorous" and (2) arguably "inconsistent with reports of wholly debilitating symptoms." (AR 22.) For instance, Naumann reported in 2011 that she was able to: care for herself, her cats and her garden, complete household chores, socialize with her friends outside the house, and attend racing and truck/tractor pull events, even though she "need[ed] to get up frequently" and had decreased her attendance at these latter events.

(AR 311, 315-16.)[9]

The ALJ also raised a concern about the short amount of time between when Naumann was laid off in November 2010 and her alleged onset date of December 1, 2010, which appears to have support in the record. Specifically, on the disability report form SSA 3367, Naumann's interviewer noted that the explanation for her alleged onset date was that "SGA ended when laid off in the month of November, 2010." (AR 291.) Similarly, her disability report form SSA-3368, states that she stopped working "[b]ecause of my condition(s) and other reasons," while still adding "I was laid off in Nov, 2010." (AR 294.) On that form, Naumann further stated that she made changes in her work activity as of May 1, 2010. (*Id.*) And in the case development worksheets, she is listed as having "stopped working due to lay off." (AR 437; *see also* AR 464 ("Clmt reports work ended due to lay off.").) Relatedly, Naumann acknowledged working full-time for five months in 2013, which ceased because the company had "[n]o business coming in." (AR 79.) Naumann further testified that she made an effort at work "to get up from [her] desk [and] move as often as [she] did" and that she took "more breaks . . . just to get up and

---

[9] Specifically, in her May 2011 function report, Naumann explained that she used to attend stock car races and tractor pulls more frequently. (AR 315-16.) In her July 2011 form, she stated that: it was "hard[er] to get showered daily," her "chores [were] limited to small bits," and she was "riding [the] mower only occasionally." (AR 323.) In another July 2011 form, she stated that "[i]t [was] becoming more difficult to complete daily living activities," which she attributed to her ongoing and increasing depression. (AR 330.) In a June 2014 letter to her prior attorney, Naumann stated that she "no longer visit[ed her] friends in their homes to play cards or any other social event[s]." (AR 381.) She also referred to "never clean[ing] the house, mow[ing] the lawn, d[oing] laundry . . ., [going] clothes shopping, [or] d[oing] personal care, chores and or grocery shopping on the same day. Personal care and shopping can and often cause excessive fatigue and moderate to severe pain." (*Id.*)

get away from the desk," which was not a problem for her employer. (AR 96.)[10] However, because the ALJ's credibility determination is riddled with "serious errors in reasoning rather than merely the demeanor of the witness," remand is necessary on this basis alone. *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004).[11]

## II. Discounting Treating Physician

As an initial matter, "[a]n ALJ who does not give controlling weight to the opinion of the claimant's treating physician must offer 'good reasons' for declining to do so." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)). Here, the ALJ failed to do so despite expressly discounting Dr. Gage's opinions as claimant's treating physician for some 15 years.[12]

Generally speaking, the opinions of a claimant's treating physician are "give[n] more weight" because he or she is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative

---

[10] As claimant argues, it is possible that her employer was "lenient or altruistic" and that she was "employed full time without being capable of substantial gainful activity," *see Garcia*, 741 F.3d at 760, in 2013, however this was not considered by the ALJ and should be considered in the first instance on remand. (*See* Pl.'s Opening Br. (dkt. #12) 14-15)

[11] As a tangential point, despite the negative credibility determination, the ALJ purports to have "giv[en] her subjective reports the greatest benefit of the doubt." (AR 27.) At best, this statement and the ALJ's analysis appear internally inconsistent.

[12] The court recognizes that there are some inconsistencies within Dr. Gage's records. (*Compare* AR 482 (noting claimant's fibromyalgia diagnosis was 16 years old) *with* AR 469 (noting claimant's fibromyalgia diagnosis was first documented in 2007).)

examinations." 20 C.F.R. § 404.1527(d)(2) (2010).[13] Even where a treating physician's opinion is not given *controlling* weight, a number of factors must be considered by the ALJ to determine how much weight to give different medical opinions. *See* 20 C.F.R. § 404.1527(d) (2010). These factors include: "[l]ength of treatment relationship and the frequency of examination"; "nature and extent of the treating relationship"; supportability; consistency; specialization; and "[o]ther factors . . . which tend to support or contradict the medical opinion." *Id.* § 404.1527(d)(2)-(6).

Here, the ALJ gave only "some weight" to the written opinions of Dr. Gage because: (1) Gage had only seen the claimant a handful of times before issuing each opinion; (2) Gage appeared to imply that the limitations applied since 2007, which was inconsistent with the alleged onset date of December 1, 2010, and her later employment and receipt of unemployment benefits; (3) the limitations were inconsistent with her daily activities; (4) Gage's answers to the August 2011 questionnaire appeared to rely on claimant's "subjective report of symptoms and limitations"; (5) the July 2012 letter consisted of an opinion that "claimant's fibromyalgia is debilitating and disabling," which was a question "reserved to the Commissioner"; and (6) in July 2012, the claimant still had symmetrical reflexes and a normal range of motion, despite reporting "disabling and debilitating" symptoms and her medicines were "not tremendously" helpful. (AR 23-24, 26.)

While it is true that Dr. Gage only saw the claimant two or three times before writing each of his opinions, this criticism ignores the fact that Gage had been Naumann's primary physician for approximately fifteen years *and* that treatment relationship predated

---

[13] This language is now found at 20 C.F.R. § 404.1527(c)(2).

her fibromyalgia diagnosis. (*See* AR 449.) Further, on closer reading of Gage's opinions, he does not actually suggest that her limitations began in 2007 -- he refers to October 24, 2007, as the "[f]irst mention of fibromyalgia in office note."[14] (AR 453.) He also makes the same reference in his July 2012 letter, adding that Naumann "has carried the diagnosis since that time." (AR 469.)

As to whether the doctor's limitations were consistent with her reported activities and work history, the ALJ is probably correct because the claimant did work full-time in 2013, and she reported being very active. However, Naumann also stated that her household chores (dishwashing, housecleaning, and lawn mowing) took about 20-30 minutes and only required standing or sitting in one place for that same amount of time. (*See* AR 313.) Neither statement is inconsistent with Gage's opinions. (*See* AR 452 (opining she could stand for less than 2 hours and sit for about 2 hours); AR 468 (opining she could sit or stand for 1-2 hours before needing to change positions).)

Regarding the concern that the questionnaire was based on claimant's subjective reporting, the ALJ relied on Dr. Gage's response that he had "not asked" about how often Naumann's "experience of symptoms [was] severe enough to interfere with attention and concentration," to "imply[ that] he was asking the claimant for her subjective reports of limitations, rather than providing his own opinion on her capabilities," such that he "uncritically accept[ed] as true most, if not all, of what the claimant reported." (AR 24, 451.) This, too, is an overreach on the record here. Doctors routinely rely on their

---

[14] Moreover, this was in answer to a specific question posed in the August 2011 questionnaire: "What is the earliest date that the description of symptoms and limitations in this questionnaire applies?" (*See* AR 453.)

patients' report of symptoms for diagnosis and treatment purposes, especially with fibromyalgia. Regardless, Gage's written response of "not asked" could simply mean that during their treatment relationship, he never asked her about interference with concentration and attention, *not* that he was merely filling out the form based solely on information provided by Naumann.

Turning to the July 2012 letter, while the ALJ characterizes it as simply opining on a question within the Commissioner's purview, that does not appear to be a fair reading. Instead, the letter: (1) outlines Dr. Gage's treating relationship with the claimant; (2) describes the history of her diagnosis, including the location of her tender points, her other fibromyalgia symptoms, and differential diagnosis; (3) rules out other possible causes; (4) explains her use of medications to control her symptoms, including how they may have delayed the worsening of her symptoms; (5) sketches out her physical limitations; and (6) details her prognosis. (AR 468-69.)[15] Finally, having symmetrical reflexes and a normal range of motion does not contradict claimant's reports of worsening symptoms and decreasing medicinal efficacy. *See Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018) (recognizing that "fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment") (citing *Vanprooyen v. Berryhill*, 864 F.3d 567 (7th Cir. 2017)).

Importantly, the ALJ also gives "some" weight to the opinions of Dr. Reintjes. (AR 27.) Yet, the ALJ recognized that Reintjes' conclusion that the definition of fibromyalgia

---

[15] Notably, even if Gage's letter simply opined that claimant was "disabled," the ALJ would still need to consider it. While the question of disability under Social Security law is reserved for the Commissioner, that question is "depend[ent] on the applicant's physical and mental ability to work full time, and that is something to which medical testimony is relevant and if presented can't be ignored." *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013).

was not met was reached after a fifteen-minute exam, casting doubt on his conclusions, particularly given claimant's years of treatment for fibromyalgia *and* having met the American Rheumatological criteria. (AR 27.) If anything, Reintjes' narrative seems to do what Dr. Gage was faulted for doing: reciting what the claimant said. Specifically, Reintjes reported: (1) Naumann's complaints of arthritis pain in her hands and feet; (2) Naumann's overview of her history with fibromyalgia, which he faulted for lacking a description of the tender points; (3) Naumann's statement that the gabapentin "has been relatively helpful"; and (4) Naumann's assessment that she could walk "up to one block," but then needed "30 to 60 minutes of rest," stand or sit for 2 hours and lift 5 pounds at a time. (AR 496.) Given Dr. Gage's fifteen years treating Naumann, it is at best illogical to give the opinions of Dr. Reintjes the same weight.

## III. RFC

The ALJ concluded that Naumann retained the "residual functional capacity to perform less than the full range of sedentary work" because (1) she needed to "alter her position after two hours," (2) could only "occasionally stoop and finger, bilaterally," and (3) could not kneel or be exposed to frequent vibration, but that she "would not be off task more than 10% of the work period." (AR 17.) Sedentary work, as defined by the Social Security Administration,

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

As the ALJ noted, his RFC was more restrictive than those proposed by the state agency and consultative physicians. (AR 27.) However, claimant appears to argue that the ALJ failed to incorporate the following non-exertional limitations: chronic pain, fatigue and depression, which necessitated frequent and unscheduled breaks and frequent absences from work, as well as limitations in her ability to handle stress, changes in routine and pace. (Pl.'s Opening Br. (dkt. #12) 24-26.) In response, the government argues that: (1) the ALJ's restrictions "accounted for all of Plaintiff's symptoms that the evidence supported"; and (2) "Plaintiff's disagreement boils down to a disagreement with the ALJ's credibility analysis regarding Plaintiff's complaints as well as the ALJ's decision not to give her treating physician controlling weight." (Opp'n (dkt. #13) 5, 10.)

Certainly, claimant's disagreement *is* with the ALJ's conclusions, which as discussed above warrant remand. In May 2011, claimant explained that she has "major trouble getting comfortable enough to get to sleep and stay asleep because of the pain in [her] hips and neck/shoulder area," which causes "a great deal of fatigue the next day" and requires her to "sleep during the day." (AR 312.) Because of her pain and fatigue she sometimes did not even leave the house. (AR 316.) She also reported spending 6-8 hours in bed and napping during the day. (AR 319.)

In his August 2011 office note and questionnaire, Dr. Gage noted her chronic fatigue and considered it to be "very debilitating." (AR 441; *see also* AR 451 (identifying her pain and fatigue as "debilitating").) Additionally, Gage opined that she would need to miss 2-4 days of work per month and would "likely" need 2-4 unscheduled breaks of 15-

30 minutes each day or "more on a bad day." (AR 452-53.) In July 2012, he considered her fatigue "severe" (AR 468, 472), opining that "her symptoms are now worse than they were a year ago, especially in terms of her fatigue, inability to perform activities for more than an hour or 2, and the level of pain she is experiencing" (AR 469). Thus, the record contains ample evidence supporting her claims of fatigue.

Nevertheless, the ALJ gave "great" weight to Dr. Kojis' opinion that (1) claimant had only "mild" or no limitations in the "B" Criteria and (2) her depression was not severe. (AR 16, 426, 433.) In doing so, the ALJ ignored the fact that that opinion is from June 2011. In December 2013, Dr. Gage tied the claimant's increasing fibromyalgia symptoms to "a fair amount of stress at work." (AR 482; *id.* ("Fibromyalgia, major flare despite lifestyle improvements and cholesterol improving. This may be secondary to being somewhat stressed at work; but is much worse now than it had been previously.").)[16] In May 2011, Naumann stated in her function report that she did "not [handle stress] well at all." (AR 317.) In a September 2012 letter to her former attorney, she explained that "stress is a major issue affect[ing] my neck and upper shoulders with the severe pain and the fatigue . . . creating the need for additional breaks in an attempt to alleviate the stress which does not happen in the work place easily without conflict." (AR 342.) During this same time period, Dr. Gage also considered her depression to be "significant" or "severe," and described it as "responding only partially to medications." (AR 394, 401.) Claimant similarly testified that her depression "makes [her] not want to do anything" and leaves her "in such a, a dark place . . . that [she] really do[es]n't feel like doing anything." (AR

---

[16] To be fair, it appears Gage only referenced her "anxiety issues" once before that. (*See* AR 394.)

56.)[17]  Thus, this ground also warrants remand.

ORDER

IT IS ORDERED that: The decision of defendant Nancy A. Berryhill, Acting Commissioner of Social Security, denying claimant Katrina Naumann's application for disability and disability insurance benefits is REVERSED AND REMANDED.  On remand, the court recommends that the Social Security Administration transfer this case to a different ALJ.  *See Sarchet v. Chater,* 78 F.3d 305, 309 (7th Cir. 1996).

Entered this 3rd day of October, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[17] On the other hand, the record does not appear to contain evidence supporting her request for limitations based on her inability to handle pace or changes in routine.  For instance, on her May 2011 function report in response to a question about how she handled routine changes, she responded "it is an inter[r]uption but then I need to get into a routine again."  (AR 317.)  That is markedly different from her "not well at all" response to being asked how she handles stress.  (*Id.*)